STATE of Iowa, Plaintiff–Appellee,

v.

Terry Ray HUNT, Defendant–Appellant.

No. 10–0515.

Court of Appeals of Iowa.

April 27, 2011.

Bethany J. Currie of Johnson, Sudenga, Latham, Peglow & O'Hare, P.L.C., Marshalltown, for appellant.

Thomas J. Miller, Attorney General, Kevin Cmelik, Assistant Attorney General, Jennifer Miller, County Attorney, and Paul Crawford, Assistant County Attorney, for appellee.

Heard by SACKETT, C.J., and POTTERFIELD and DOYLE, JJ. TABOR, J., takes no part.

DOYLE, J.

Terry Hunt appeals his convictions and sentences for attempted murder and willful injury as a habitual offender. He claims the district court erred in (1) finding him competent to stand trial, (2) failing to grant a mistrial during the State's voir dire of the jury, (3) failing to grant a mistrial after one of the State's witnesses violated the court's ruling on a motion in limine, (4) admitting cumulative photographs of the victim's injuries, and (5) instructing the jury regarding an element of attempted murder. He additionally claims the evidence was not sufficient to establish he intended to seriously injure the victim and cause her death. We reject

all of Hunt's claims and affirm the judgment of the district court.

## I. Background Facts and Proceedings.

Terry Hunt severely beat his sixty-seven-year-old mother, Sandra Uhde, in the early morning hours of January 8, 2008, after a night of drinking and smoking crack cocaine. The events leading to the assault began in the morning on January 7 when Hunt asked his mother for money to buy beer. She was his payee for social security disability benefits he received after suffering two serious head injuries. Hunt moved in with his mother in 2005 when his second head injury left him unable to live on his own. Uhde gave Hunt ten dollars, and he bought a large can of beer. Once that beer was gone, Hunt went back out and bought another. He asked Uhde for more money in the afternoon. She took him to a bank, gave him $200 from her savings account, and dropped him off in an alley.

Later that night, Hunt went to Katherine and John Moore's house. The three of them purchased a twelve-pack of beer and some crack cocaine. Around midnight, Katherine drove Hunt to his mother's house. He rang the doorbell repeatedly. When Uhde did not open the door, he began pounding on the windows of the house, yelling, "Let me in!" Uhde called the police.

A police officer arrived at Uhde's house at 12:05 a.m. Hunt was standing at the front door, trying to get in. The officer pulled into the driveway, and Hunt walked over to talk to him. He told the officer he wanted money from his mother. The officer went to the door to talk to Uhde. She gave the officer twenty-five dollars to give to Hunt, but told him to tell Hunt she did not want him to come back to the house that night. The officer gave the money to Hunt and relayed his mother's message to him.

Hunt and Katherine left and bought more beer and crack cocaine. Around 1:30 or 2:00 a.m., the Moores told Hunt it was time for him to leave. He went back to his mother's house and rang the doorbell. Uhde did not answer, so he left. Hunt went back to the Moores, but they would not open their door either.

Hunt returned to his mother's house around 2:30 a.m. He pounded on the front door and rang the doorbell. Uhde opened the inside door and talked to him through the locked storm door. She had her phone in her hand. Hunt screamed at her as he was beating the door's window that if she did not let him in he would break the window. Then he lowered his voice and said, "[M]om, I just want to come in and go to bed, I'm tired." Believing him, Uhde opened the door.

Hunt rushed in and pushed Uhde down, knocking her phone to the floor. He said, "I'm here to kill you," and slammed her head against the wall. Hunt kicked Uhde repeatedly, telling her, "I want your head to feel like my head feels every day of my life." He picked her up by her hair and threw her through the closet door. Then he started choking her, saying, "[D]on't ever ever call the police on me again." He dragged her by her hair into the kitchen and said, "[Y]ou killed my dad, now I'm going to kill you, my dad didn't deserve to die but you do, and I'm going to kill you by choking you to death."

At that moment, the police burst through Uhde's front door. When the phone was knocked out of Uhde's hand, it redialed the last number called—Hunt's friend Katherine. She did not hear the phone ring, but noticed a message on her answering machine before going to bed. She listened to the message and recog-

nized Hunt's voice. Katherine heard the ongoing assault and immediately called the police.

When the police arrived, Hunt was standing over Uhde in the kitchen. She was bruised and bloodied. Hunt was arrested and charged by trial information with attempted murder and willful injury. He pleaded not guilty and filed an application to determine his competency to stand trial. The district court ordered him to undergo a psychiatric evaluation by Dr. Dan Rogers.

Dr. Rogers examined Hunt in April 2008. He opined Hunt's "memory and thinking abilities are so impaired that he is not able to assist in his defense and he is not competent to stand trial." The State asked for a second evaluation, which was performed by Dr. Robert Metzger at the Iowa Medical and Classification Center (IMCC) at Oakdale. After observing Hunt for two months, Dr. Metzger opined he was competent, stating:

> In summary, Mr. Hunt is an individual with a reported history of serious head injury. Despite this, his functioning during our evaluation suggested limited impairment and there was evidence of many competence related abilities, such that he should be able to go forth and effectively assist in his defense should he so choose.

Following a competency hearing, the district court entered a ruling finding the "evidence concerning the defendant's competency is in equipoise. Therefore, the presumption of competency prevails." Hunt filed a notice of his intent to rely on the defenses of insanity and diminished capacity prior to the jury trial in February 2010. He also filed a motion in limine seeking, among other things, to prevent the State from mentioning his prior criminal convictions. The district court granted that request but denied Hunt's request to limit the photographs of Uhde's injuries that the State intended to introduce into evidence.

The case proceeded to trial, during which Hunt made two motions for a mistrial due to claimed errors by the State. The first occurred during the State's voir dire of the jury, and the second occurred during Uhde's testimony when she referred to Hunt's past convictions for operating while intoxicated. The court denied both motions. At the close of the State's evidence, Hunt moved for a judgment of acquittal, arguing the State had not presented sufficient evidence on his intent to seriously injure his mother or cause her death. The court denied the motion, which Hunt renewed at the close of all evidence. The motion was again overruled, and the case was submitted to the jury.

Hunt was found guilty as charged. He filed a combined motion for new trial and in arrest of judgment, both of which were denied by the district court after a hearing. Hunt admitted he had two prior felony convictions and was sentenced as a habitual offender. He appeals.

## II. Discussion.

### A. Competency.

Hunt claims the district court erred in determining he was competent to stand trial. Our review of this issue is de novo. *State v. Lyman*, 776 N.W.2d 865, 873 (Iowa 2010).

A defendant is presumed to be competent to stand trial. *Id.* at 874. The defendant has the burden of proving incompetency by a preponderance of the evidence. *Id.* The test to determine competency is defined by statute "as whether 'the defendant is suffering from a mental disorder which prevents the defendant from appreciating the charge, understand-

ing the proceedings, or assisting effectively in the defense.'" *Id.* (quoting Iowa Code § 812.3(1) (2007)). "If the evidence is in equipoise, the presumption of competency prevails." *Id.* The district court found the evidence in equipoise in this case. We agree.

Hunt's expert witness, Dr. Rogers, conducted a thorough review of Hunt's medical and social history, administered several psychological tests, and observed Hunt while interviewing him. Dr. Rogers noted that Hunt had suffered serious head injuries in 1993 and 2005. Although he recovered fairly well from the first injury, the second one affected his walking, balance, and memory. Dr. Rogers testified that consistent with Hunt's serious brain injuries, test results showed "his memory and his abilities in specific areas are so impaired that he's not competent to stand trial." He stated that while Hunt "has a basic comprehension of the legal process .... he's simply not able to apply that knowledge effectively." Dr. Rogers testified Hunt was unable to "reason and recall information in a manner that would allow him to report his memory accurately to his attorney, and he would not be able to effectively challenge witnesses." He recommended that Hunt be placed in a nursing home, as he "cannot be expected to live independently or to handle his own affairs."

The State's expert witness offered a diametrically opposed view of Hunt's competency. Dr. Metzger testified that after observing Hunt for two months at the IMCC, he saw no signs of dementia as Dr. Rogers did. He stated Hunt was "by all accounts a model patient.... He functioned at a very—really advanced level compared to some of the other folks that we have on the unit." Dr. Metzger found Hunt was able to correctly identify the charges against him, as well as the range of possible penalties. He knew the role of the judge, jury, defense attorney, and prosecutor and was able to state what pleas were available to him. According to Dr. Metzger, Hunt "conveyed a clear understanding of how evidence is used in court and frequently pointed out perceived inconsistencies in the case against him." He noted that while Hunt initially claimed not to remember the attack on his mother, he was eventually able to recall some information.

■ Given Dr. Metzger's findings, we agree with the district court that Hunt was unable to overcome the presumption of competency. We accordingly affirm the court on this issue and turn to Hunt's next assignment of error.

### B. Jury Voir Dire.

During the State's voir dire of the jury, the prosecutor engaged in the following conversation with a prospective juror:

I have to prove that [Hunt] intended to cause his mother a, what they call, serious injury under the law.

And attempted murder, I have to try and prove that Defendant intended to kill his mother. So, to prove intent I'm asking you to figure out what was going on inside his head. So, if you're not a mind reader, how do you think you'd feel about figuring out what Mr. Hunt was thinking?

. . . .

MS. KEELER: Listen to every aspect of the case and not be judgmental.

MR. CRAWFORD: Okay. So pay attention to—

MS. KEELER: Every aspect.

MR. CRAWFORD: What was said?

MS. KEELER: Yeah.

MR. CRAWFORD: Okay. What his actions were?

MS. KEELER: Yes.

MR. CRAWFORD: Like, for example, you hear kids on a playground a lot [saying] I'm going to kill you. Do they actually do it?

MS. KEELER: That would be a threat, yes.

Hunt objected to the hypothetical outside the presence of the jury, arguing the State had

describe[ed] the specific allegation in this case and tr[ied] to highlight to the jury, to this particular juror and to the pool, that when that exists, all right, then you can determine specific intent of the person. It wasn't even really a hypothetical. It is the exact language [used by Hunt]. . . .

The district court denied the motion for mistrial but cautioned the State:

[Y]ou have one foot that is adjacent to the line and the other one is planted in mid-air above it. I would suggest that you move on and not get any more examples of such as the one that you did there. That was . . . really close. That's a close question, but I believe you are correct in that the juror herself suggested that it was important not to rely upon what is said but the actions of the participant. . . .

Hunt argues this was in error because "the jury would believe they could determine specific intent from hearing those words based on Mr. Crawford's jury selection process." We disagree.

■ "The manner of conducting voir dire and its scope are not specifically addressed by rules of procedure in Iowa." *State v. Windsor*, 316 N.W.2d 684, 686 (Iowa 1982). Our supreme court has said, however, that wide latitude must be afforded to counsel in examining jurors. *State v. Tubbs*, 690 N.W.2d 911, 915 (Iowa 2005). The purpose in allowing latitude in counsel's inquiry "is to provide information to

assist counsel in deciding how to exercise challenges." *Windsor*, 316 N.W.2d at 686; *see also Mu'Min v. Virginia*, 500 U.S. 415, 431, 111 S.Ct. 1899, 1908, 114 L.Ed.2d 493, 509 (1991) ("*Voir dire* examination serves the dual purpose of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges."). Control of the jury selection process is lodged in the sound discretion of the trial court. *Tubbs*, 690 N.W.2d at 915. "We will reverse only if the court has manifestly abused its discretion." *Id.*

■ We believe a reasonable view of the question asked in this case is that the prosecutor was attempting to assess whether the potential juror would approach the case fairly and impartially. *See Windsor*, 316 N.W.2d at 687 (stating the underlying purpose of voir dire is "to secure a fair and impartial jury"). Although the prosecutor used the same words in his hypothetical that Hunt used during the attack on his mother, the hypothetical was actually favorable to Hunt because it suggested that words are not always indicative of intent. Obviously, when children on the playground say, "I'm going to kill you," they do not intend to actually do so. *See State v. Clark*, 981 S.W.2d 143, 146 (Mo.1998) ("When ruling on the propriety of a particular question, the trial court must consider the question within the context of the case."). We accordingly find no abuse of discretion in the court's denial of Hunt's motion for mistrial on this ground. We now turn to Hunt's second motion for mistrial.

### C. Prior Criminal Convictions.

■ Before the trial began, the district court granted Hunt's request to prohibit the State from mentioning his prior criminal convictions. Hunt claims the State violated this ruling during its questioning of Uhde. The prosecutor asked Uhde, "Terry

has, as I understand it, had difficulties with alcohol; is that correct?" She responded, "At a young age. Started at 17. OWIs." Hunt immediately objected and moved for a mistrial once the jury was removed from the courtroom. The court denied the motion, stating: "I believe that that simply was a slip of the tongue or inadvertence on the part of Miss Uhde, and I don't think that Defendant has been prejudiced thereby." We agree.

■ A trial court has broad discretion in ruling on a motion for mistrial. *State v. Brown*, 397 N.W.2d 689, 699 (Iowa 1986). This is because the trial court is in a better position than this court "to gauge the effect of the matter on the jury." *State v. Waters*, 515 N.W.2d 562, 567 (Iowa Ct. App.1994). The pertinent question for us to decide is whether the court was clearly unreasonable in concluding a fair and impartial verdict could be reached notwithstanding Uhde's brief reference to "OWIs." For the following reasons, we find no abuse of discretion.

First, one of Hunt's defenses at trial was diminished capacity due to his intoxication the night of Uhde's assault. On cross-examination, Hunt's counsel asked Uhde, "Terry has had significant problems with alcohol in his life; is that right?" She responded, "That's correct." Defense counsel continued, "And he's had a problem with drug abuse; is that right? A. Yes." Later on during cross-examination, Hunt's attorney asked Uhde, "Whatever problems he was having would be worsened by drinking? A. Yes. Q. And worsened by drug abuse. A. Yes." Other witnesses were also asked by defense counsel about Hunt's substance abuse the night of the attack.

Second, the incident was isolated and brief. Prejudice usually results from persistent efforts to inject prejudicial matter before the jury rather than isolated prose-

cutorial misconduct. *See State v. Anderson*, 448 N.W.2d 32, 34 (Iowa 1989). Finally, as will be discussed in more detail later in this opinion, the evidence against Hunt was strong. *Id.* (finding it significant in examining whether prosecutorial misconduct prejudiced defendant that evidence of his guilt "was ironclad"). On the whole, we conclude Hunt has not shown how his mother's brief reference to his OWI convictions denied him a fair trial, especially given the repeated references to his substance abuse problems in general throughout the trial. *See id.* at 33 ("A prosecutor's misconduct will not warrant a new trial unless the conduct was 'so prejudicial as to deprive the defendant of a fair trial.' " (citation omitted)).

### D. Photographs.

■ Hunt next claims the district court erred in allowing the State to show the jury multiple photographs of Uhde's injuries. The State introduced two sets of pictures. The first set was taken right after the attack. Hunt did not object to those photographs. The second set was taken a few days later and showed darkening bruises, along with some new areas of injury that were not depicted in the first set. Hunt argued all of the photographs in the second set showing the same injuries that were documented in the first set should be excluded, asserting:

> The only thing that the second set of photographs does is it just tends to pound on what is a very disturbing fact and will be for the jury that Miss Uhde was severely beaten, not severely injured, but severely beaten. The State will be able to get that point across, Your Honor, with that first set of photographs and I don't think this case is going to hinge on whether or not bruise X had fully developed in day three after

the injury versus what it was seen as on day one.

The State responded,

[I]t's not the State's fault that this is an ugly event. The State has no control over what the Defendant allegedly did to the victim. . . . The photos do show the development of bruises. Dr. Van Gundy had talked about that process during his testimony. . . .

The district court agreed with the State, as do we.

The determination to admit or to refuse admission into evidence of the photographs lies initially in the discretion of the trial court, and we will not reverse except when an abuse of discretion is shown, as where the evidence is clearly irrelevant or prejudicial.

*State v. McGhee*, 280 N.W.2d 436, 440–41 (Iowa 1979). "Ordinarily the test of admissibility of photographs is relevancy and materiality." *State v. Allen*, 348 N.W.2d 243, 247 (Iowa 1984); *see also State v. Wells*, 629 N.W.2d 346, 355 (Iowa 2001) (engaging in two-prong test to determine admissibility of photographs: "(1) whether the evidence is relevant, and, if so, (2) whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice").

The nature, extent, and severity of the injuries shown in both sets of photographs bore on the character of the assault and the intent of Hunt. *See Allen*, 348 N.W.2d at 247; *see also State v. Metz*, 636 N.W.2d 94, 99 (Iowa 2001) (concluding crime scene and autopsy photographs were admissible because they "demonstrated the violent nature of the attack and thus constituted material evidence of the State's assertion that the killing was done with malice and a specific intent to kill"). Photographs of victims' injuries are not inadmissible merely because they may evoke an emotional response from jurors. *See*

*Metz*, 636 N.W.2d at 99 (recognizing murder is " 'a gruesome affair giving rise to equally gruesome evidence—[t]hat alone is not sufficient reason to exclude that evidence' " (citation omitted)). Furthermore, even if we assume the photographs in the second set were cumulative of the first, that is also "not a sufficient reason, standing alone" to require their exclusion. *State v. Munz*, 355 N.W.2d 576, 580 (Iowa 1984). Finally, the photographs illustrated the verbal picture of the events already provided by the testimony of the victim, the responding police officers, and her treating physicians. *Id.* For all these reasons, we find no abuse of discretion in the court's decision to admit the second set of photographs into evidence.

### E. Jury Instruction.

In Instruction No. 13, the jury was instructed that in order to find Hunt guilty of attempted murder, the State must prove:

1. On or about January 8, 2008, the Defendant struck Sandra Uhde with his fists and choked her.

2. By his acts, the Defendant expected to set in motion a force of chain of events which would cause or result in the death of Sandra Uhde.

3. When the Defendant acted, he specifically intended to cause the death of Sandra Uhde.

Instruction No. 14 explicated:

Regarding element Number 2 in Instruction No. 13, the phrase "would cause or result in the death of Sandra Uhde" refers to Defendant's expectation of the consequences of his act. The phrase does not refer to the probability that Defendant's act would be successful.

Hunt takes exception to Instruction No. 14, arguing it "added unnec-

essary confusion to the marshaling instruction which was otherwise clear" and it "also unduly emphasized that the State's burden did not include that the acts themselves would have resulted in Uhde's death, but only Hunt's expectation that the acts would result in her death." We review this issue for the correction of errors at law. *State v. Marin*, 788 N.W.2d 833, 836 (Iowa 2010). Error in giving a particular instruction warrants reversal unless the record shows the absence of prejudice. *Id.*

 "A requested instruction must be given so long as it correctly states the law, has application to the case, and is not stated elsewhere in the instructions." *State v. Proctor*, 585 N.W.2d 841, 843 (Iowa 1998). Hunt is consequently correct that prejudice results when a jury instruction " 'materially misstates the law, confuses or misleads the jury, or is unduly emphasized.' " *State v. Mott*, 759 N.W.2d 140, 149 (Iowa Ct.App.2008) (citation omitted); *see also Hutchinson v. Broadlawns Med. Ctr.*, 459 N.W.2d 273, 275 (Iowa 1990) ("Parties are not ... entitled to any particular instruction if the issue is adequately covered in other instructions."). We find no such error here, however.

The language used in Instruction No. 14 comes from our supreme court's discussion in *State v. Young*, 686 N.W.2d 182 (Iowa 2004), of the uniform marshaling instruction on attempted murder and the second paragraph of the attempted murder statute, Iowa Code section 707.11.[1] In that case, the court considered whether a trial court, sitting without a jury, erred in using a jury instruction in the written verdict that stated in order for the State to establish the defendant was guilty of attempted murder, it must prove the defendant "expected to set in motion a force or chain of events which *could have caused* or resulted in the death" of the victim. *Young*, 686 N.W.2d at 184. The defendant objected to the court's use of the instruction because the applicable statute provides that a person commits attempted murder when " 'the person does any act by which the person expects to set in motion a force or chain of events which *will cause* or result in the death of the other person.' " *Id.* at 183 (quoting Iowa Code § 707.11). The defendant argued the court's substitution of "could have caused" instead of "will cause" set a lower standard because " 'will' connotes certainty, while 'could' connotes speculation or uncertainty." *Id.* at 184.

The supreme court rejected Young's argument, stating the "second paragraph of section 707.11 makes clear that 'will cause' refers to the actor's expectation of the consequences of his or her act, not the probability of the act's success." *Id.* at 185. Instruction No. 14 was therefore a correct statement of the law. Hunt nevertheless argues it unduly emphasized that the State's burden did not include showing "factual possibility or probability of success," a concept he urges was already adequately covered in Instruction No. 13. Hunt also points to the intersection be-

---

1. The first two paragraphs of the statute read in full:

A person commits a class "B" felony when, with the intent to cause the death of another person and not under circumstances which would justify the person's actions, the person does any act by which the person expects to set in motion a force or chain of events which will cause or result in the death of the other person.

It is not a defense to an indictment for attempt to commit murder that the acts proved could not have caused the death of any person, provided that the actor intended to cause the death of some person by so acting, and the actor's expectations were not unreasonable in the light of the facts known to the actor.

Iowa Code § 707.11.

tween his defense of diminished responsibility and the additional instruction on the State's burden to prove specific intent.

The court in *Young* contemplated the use of a separate instruction to explain the second element of attempted murder in appropriate cases. *See id.* at 186 n. 3 ("When applicable the district court should use a separate instruction to explain that, even if the defendant proves the defendant's act could not have caused the death of any person, this element is established if the defendant intended to cause the death of some person by so acting."); *see also Smith v. Koslow*, 757 N.W.2d 677, 682 (Iowa 2008) (stating "a supplemental instruction that properly assists the jury in the correct application of the law to the facts is not error"). While the repetition of the second element of attempted murder in Instruction No. 14 may have emphasized the State's less rigorous burden to prove specific intent, it also correctly provided the context of Hunt's expectations for the jury's consideration and so "was no more than was required for a clear presentation of the issues." *Estate of Smith v. Lerner*, 387 N.W.2d 576, 582 (Iowa 1986). Simply "repeating a rule of law is generally not held to be error." *Id.* We accordingly find no error in the court's decision to give the State's requested instruction.[2]

### F. Sufficiency of the Evidence.

Hunt finally claims the evidence was not sufficient to establish he intended to seriously injure his mother and cause her death. He argues (1) when the police arrived, he "was not assaulting or injuring his mother, despite the opportunity," (2) although Uhde suffered extensive bruising,

"none of the injuries was life-threatening or had caused life-threatening injuries," and (3) his serious brain injuries, combined with his intoxication from the alcohol and crack cocaine he ingested before the attack, prevented him "from making judgments about right and wrong or anticipating the results of his actions with regard to another." None of these facts overcome the substantial evidence in the record showing Hunt's specific intent to seriously injure his mother and cause her death.

Our standard of review of this issue is well-settled:

Sufficiency-of-the-evidence claims are reviewed for correction of errors at law. The jury's verdict is binding upon a reviewing court unless there is an absence of substantial evidence in the record to sustain it. Evidence is substantial if it would convince a rational trier of fact the defendant is guilty beyond a reasonable doubt.

When reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State, including legitimate inferences and presumptions which may fairly and reasonably be deduced from the evidence in the record.

*State v. Hennings*, 791 N.W.2d 828, 832–33 (Iowa 2010) (citations and internal quotations omitted).

"Specific intent is seldom capable of direct proof." *State v. Walker*, 574 N.W.2d 280, 289 (Iowa 1998). That is not so here. Hunt's mother testified that when Hunt began his assault on her, he said, "I'm here to kill you." Later on during the attack, he told her, "[Y]ou killed my dad, now I'm going to kill you,

---

2. We observe, however, that neither Instruction No. 14 nor the discussion in footnote three of *Young* includes the qualifying phrase in the second paragraph of section 707.11 that the defendant's expectations "were not unreasonable in light of the facts known to the actor." *Compare* Iowa Code § 707.11, *with Young*, 686 N.W.2d at 186 n. 3.

my dad didn't deserve to die but you do, and I'm going to kill you by choking you to death." Hunt's repeated threats to kill Uhde were recorded on an answering machine message that was played for the jury.

■ Circumstantial evidence also showed Hunt's intent to seriously injure and kill his mother. *See State v. Casady,* 491 N.W.2d 782, 787 (Iowa 1992) (stating intent may be established by circumstantial evidence and by inferences reasonably drawn from the conduct of the defendant and all attendant circumstances in the light of human behavior and experience). Intent to kill or seriously injure another may be inferred from the type and number of injuries suffered by the victim. *See State v. Poyner,* 306 N.W.2d 716, 718 (Iowa 1981) (stating that multiple stab wounds supply strong evidence of malice and intent to kill); *State v. Bell,* 223 N.W.2d 181, 184 (Iowa 1974) ("[T]he extent of injury may be taken into consideration in determining defendants' intent."). While Uhde's injuries were not life-threatening, they were extensive and severe.

The emergency room physician summarized the injuries as follows:

> She was complaining of a headache, pain in her ears, discomfort with swallowing, pain in her neck.... [S]he had a tremendous amount of swelling and bruising over her face, particularly over the forehead, over the left eye, underneath the left eye and around her ears. I saw she had a laceration or a cut behind her right ear. She had difficulty opening her mouth. Bruise on the lateral aspects of the neck or the side of the neck, um, and some tenderness over the posterior or the back aspect of the cervical spine.

Uhde also had "quite a bit of bruising especially over the right arm coming from near the elbow down into the hand," which indicated "she had her arms up trying to block the blow[s]." Her chest and both ears were bruised, as well as her right leg from below the knee "extending down over the top of the foot and going towards her toes." A rational trier of fact could infer from this physical evidence of Hunt's assault on his mother that he intended to seriously injure and kill her.

■ We additionally recognize the jury was free to believe or disbelieve the testimony of the witnesses and to give as much weight to the evidence as, in its judgment, such evidence should receive. *State v. Thornton,* 498 N.W.2d 670, 673 (Iowa 1993). The very function of the jury is to sort out the evidence and place credibility where it belongs. *Id.* The jury apparently rejected Dr. Rogers's testimony that Hunt was incapable of forming the requisite intent due to his brain injuries and intoxication. We will not interfere with this finding. Upon viewing the evidence in the light most favorable to the State and making all reasonable inferences that may fairly be drawn, we find sufficient evidence supports Hunt's convictions.

### III. Conclusion.

We have reviewed all of the claimed errors raised by Hunt on appeal and conclude that none of them support reversing his convictions for attempted murder and willful injury.

**AFFIRMED.**