# IN THE COURT OF APPEALS OF IOWA

No. 19-1944
Filed June 16, 2021

**BASIL PENDLETON,**
       Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
       Respondent-Appellee.
_____

       Appeal from the Iowa District Court for Scott County, Mary E. Howes, Judge.

       The applicant appeals denial of his postconviction-relief application.
**AFFIRMED.**

       G. Brian Weiler, Davenport, for appellant.

       Thomas J. Miller, Attorney General, and Bridget A. Chambers, Assistant Attorney General, for appellee State.

       Considered by Mullins, P.J., Ahlers, J., and Blane, S.J.*

       *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2021).

**BLANE, Senior Judge.**

Basil Pendleton appeals the denial of his fourth application for postconviction relief (PCR). He asserts newly discovered evidence exonerates him thirty-five years after his convictions for first-degree murder and first-degree robbery. Edward Martin, a witness in Pendleton's trial, recently recanted his testimony that Pendleton told him he committed the crime. Martin now says a police detective threatened and coerced him into telling this lie. The district court found the recantation lacked credibility and the remaining evidence of Pendleton's guilt was sufficient to support the convictions. On our review, we affirm.

Pendleton was convicted of first-degree murder and first-degree robbery in 1984 for the robbery of the St. Louis bar in Davenport. During the robbery, Pendleton and his codefendant, Daryl Hollins, shot and killed the bartender. Pendleton lost his direct appeal. *See State v. Pendleton*, No. 84-1319 (Iowa Ct. App. Nov. 26, 1985). He also lost his habeas petition and his first three applications for PCR. *See Pendleton v. Hundley*, No. 95-3391, 1996 WL 224108 (8th Cir. May 6, 1996); *Pendleton v. State*, No. 02-1709, 2004 WL 57581 (Iowa Ct. App. Jan. 14, 2004); *Pendleton v. State*, No. 11-1786, 2012 WL 3027143 (Iowa Ct. App. July 25, 2012).

On Pendleton's fourth application for PCR, we reversed a summary dismissal and remanded for a hearing. *See Pendleton v. State*, No. 15-0069, 2017 WL 362591, at *3 (Iowa Ct. App. Jan. 25, 2017). The PCR court heard the merits of the claim in fall 2019 and denied relief. Pendleton appeals.

Pendleton's claim is based on the Iowa Code provision a person may seek postconviction relief if "[t]here exists evidence of material facts, not previously

presented and heard, that requires vacation of the conviction or sentence in the interest of justice." Iowa Code § 822.2(1)(d) (2013). We review PCR proceedings based on newly discovered evidence for corrections of errors at law. *See More v. State*, 880 N.W.2d 487, 498 (Iowa 2016). To prevail on this claim, the applicant must show:

> (1) that the evidence was discovered after the verdict; (2) that it could not have been discovered earlier in the exercise of due diligence; (3) that the evidence is material to the issues in the case and not merely cumulative or impeaching; and (4) that the evidence probably would have changed the result of the trial.

*Id.* (quoting *Jones v. State*, 479 N.W.2d 265, 274 (Iowa 1991)). "The standard for whether the evidence probably would have changed the result of the trial is a high one because of the interest in bringing finality to criminal litigation." *Id.*

Pendleton contends that the PCR court erred in concluding the recantation of Martin's testimony would not have resulted in a not-guilty verdict. Under oath before a grand jury, in a pre-trial deposition and at the criminal trial, Martin testified that Pendleton told him he was involved in a robbery and someone was killed. At the PCR hearing, Martin testified he knew Pendleton as a child growing up and saw him in Davenport roughly in the timeframe of the offenses. Martin originally went to Davenport police, according to his recollection, to report Pendleton for stealing his stereo. While talking to police, the officer mentioned the robbery at St. Louis Bar and told Martin to say Pendleton was the robber. Martin was fifteen or sixteen at this time and spoke to police without his parents. He was unaware of the robbery until the officer mentioned it. He testified the police officer threatened to charge him with the murder if Martin did not point to Pendleton. Martin explained, "I was scared, and, you know, I didn't know what to do. You know, like

I said, I was a juvenile, and I was scared, and I just did what the police officer asked me to do." The officer also told him to implicate Pendleton in the robbery "because the stereo he couldn't do nothing about." Martin did not recall the name of the officer. Martin later testified in front of a grand jury, in a deposition, and at the jury trial. In the early 2010s, he ran into Pendleton's daughter at a gathering and told her he lied. He said he would sign an affidavit to that effect.

Detective Mike Hammes testified he conducted the investigation into the robbery and murder, including twenty to thirty interviews with witnesses and suspects. He said Martin approached two officers on foot and told them he had information about the robbery. Those officers told Hammes, and Hammes went to Martin's home to interview him. Hammes said their conversation was "very cordial" and he never threatened Martin with prosecution. Martin's report was not coerced or forced from him in any way. Hammes described Martin as "very outgoing" and said "[h]e came out and told—he told [me] everything." And he testified Martin was never a suspect. Martin told Hammes he was walking with Pendleton and Pendleton said "not to tell anybody but that he killed that lady at the tavern because she had seen his face." When asked whether Martin was motivated to point the finger at Pendleton over the stolen stereo, the officer testified the stereo theft did not happen until several days after his interview with Martin.

We must look at the other evidence in the record to determine whether Martin's recantation would have changed the result of the trial. The bar owner, Frank Lingard, testified he saw two black men running out of the bar. When he went in, he saw the bartender on the floor. She had been shot through the stomach

and died.  But Lingard could not positively identify Pendleton as one of the two robbers.

Tawana Harris, Pendleton's then fiancée, testified that early in the morning after the night of the robbery, Pendleton came home nervous, shaking, and sweating.  He seemed upset about something, and when Harris asked what was wrong, he said he had "just robbed a place and somebody got shot."  He had a bank bag with cash in it and a gun.  Pendleton explained to her:

> He said that they had got a gun from a guy in a bar, and that they had went to St. Louis Bar, and held up the lady, the bartender, she was alone, and he said that he asked her, "How do you open the cash register?" and she lied, told him that you push a button underneath the cash register, and he knew better, so he put the gun—they put the gun up to her and asked her, "We know that you're lying," you know, "tell us how to do it," so she told them, and he turned around, and while he was getting the money, he heard the gun go off, and he turned around, and he told me that [codefendant] Daryl [Hollins] had shot the woman, she was laying on the floor at the time, he told me that he had her on the floor, with the gun up to her.

Pendleton and Harris went to another bar in Rock Island and sold the gun.  Later on, Pendleton and Harris talked about the robbery and murder more.  Pendleton said the bartender was shot because "she could identify them, she seen their faces."  Pendleton also told Harris he wanted her to testify that Pendleton was home with her when Hollins "came busting in and telling us that he had just, you know, robbed and killed someone."  In early September, approximately two weeks after the robbery, Pendleton and Harris moved to Milwaukee, Wisconsin.

Michelle Perkins testified she was at a bar with Pendleton and Harris.  Pendleton spoke alone with Perkins, and they discussed the robbery.  Pendleton said, "I guess you heard what happened."  Then Pendleton "said something to the effect of 'I was there,' or something along that line.  He was involved, or he was

there." He asked Perkins to hold onto a package for him. It was a small, flat, brown bag about six inches long and four inches wide. She put it behind the bar for him, and fifteen minutes later, he came and picked it up, saying he was going to Rock Island. Pendleton and Harris left together.

Will Stanley Davis was at the bar in Rock Island when Pendleton and Harris came in. In their conversation, Pendleton said "that he had did something down there, robbed the St. Louis Bar, him and some other guy, and he believed that they had killed this person."

Viewing the circumstances in full, we ask whether Martin recanting his story would have changed the result of the trial. We conclude it would not. First, we look at recantation testimony with extreme skepticism. *Jones*, 479 N.W.2d at 275 ("We have repeatedly held that a witness' recantation testimony . . . is looked upon with the utmost suspicion."). Second, the district court made explicit findings that Martin's testimony was not credible and Hammes's was. "[W]e give weight to the lower court's findings concerning witness credibility." *Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001). Martin said Hammes threatened to accuse him of robbery and murder if he did not point his finger at Pendleton. Hammes said that did not happen, that Martin came to police with the admissions Pendleton made, and that Martin willingly gave him the information without any force or coercion. Hammes also said Martin was never a suspect in the robbery and murder, making it unlikely Hammes would have threatened him with prosecution. The interview took place in Martin's home, rather than a potentially coercive police department. According to Hammes's testimony, Martin's story about the stolen stereo does not

make chronological sense, undercutting Martin's claims about Hammes's statements to him.

Further, even if we were to accept Martin's testimony as true, there is ample evidence in the record to support the verdicts, including Pendleton's admissions to others. Harris explained his appearance and demeanor that morning and his admission that he was involved in the robbery and shooting, as well as the items in his possession—including a bank bag of cash and a gun—and how he disposed of them. Perkins's interaction with Pendleton led to an independent admission to her and tracks Harris's explanation that they sold the gun at a bar in Rock Island. And Davis independently received the same admission from Pendleton. Harris and Davis both heard from Pendleton that the robbery escalated to a murder because the bartender saw Pendleton's face and could identify him. Even taking away Martin's statements from this, the record is adequate to identify Pendleton as the robber and support the convictions. Martin's recantation would not have led to a different verdict.

Pendleton's strategy on appeal is to attack the witnesses and their credibility. It is not a winning strategy. A jury found those witnesses credible, and Martin rescinding his statements does not impugn them in this case. *See State v. Hunt*, 801 N.W.2d 366, 377 (Iowa Ct. App. 2011) ("[T]he jury was free to believe or disbelieve the testimony of the witnesses and to give as much weight to the evidence as, in its judgment, such evidence should receive. The very function of the jury is to sort out the evidence and place credibility where it belongs." (citation omitted)). Three other witnesses gave credible and consistent testimony that Pendleton committed the crime and admitted it. Taking Martin's recantation into

account, as well as the court's credibility determinations, and applying weight accordingly, we find the PCR court did not err in determining the newly discovered evidence probably would not change the verdict to not guilty. For that reason, we affirm.

**AFFIRMED.**