# IN THE COURT OF APPEALS OF IOWA

No. 22-0936
Filed February 7, 2024

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**REGINALD EUGENE STEWART, JR.,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Dubuque County, Thomas A. Bitter, Judge.

A defendant appeals his criminal convictions raising double jeopardy, insufficient evidence, and evidentiary claims.  **AFFIRMED.**

Lucas L. Asbury of Trey Sucher Law, PLC, Windsor Heights (until withdrawal), and Shea M. Chapin of The Chapin Center, PLC, Dubuque, for appellant.

Brenna Bird, Attorney General, and Sheryl Soich, Assistant Attorney General, for appellee.

Heard by Tabor, P.J., and Badding and Buller, JJ.

**BADDING, Judge.**

An ordinary Thursday night turned violent when Reginald Stewart sliced his girlfriend's head, back, and legs with a pocketknife and beat her with brass knuckles. A jury convicted Stewart of attempt to commit murder, willful injury causing serious injury, and three counts of domestic abuse assault. Stewart appeals, raising double jeopardy, insufficient evidence, and evidentiary claims. We affirm.

## I.      Background Facts and Proceedings

At around 7:30 a.m. on December 3, 2021, eleven-year-old B.H. sent his dad a video showing blood splattered all over the upstairs of the home he shared with his younger brother; their mother, Jill; and her boyfriend, Reginald Stewart. While narrating in a whispered voice, "[t]here's blood on here, right there, right there," B.H. panned the video to smears of blood on the hallway walls and bathroom door. In the bathroom, B.H. pointed out drops of blood on the sink, counter, and floor and brass knuckles in the bathtub.

Frantic, the children's dad drove to Jill's mother's house, where they called 911 to request a welfare check. Corporal Jordan Waddick and Officer Jonathan Brokens were dispatched to Jill's home. Before knocking on the front door, Waddick called Jill's cellphone. She answered, telling Waddick that she and her sons were out of town. Sensing something was off, the officers walked around the house. Brokens saw movement inside, prompting Waddick to try Jill's phone again. They could hear the phone ringing inside. When Jill answered, she "became really defensive," according to Waddick. She told him that he was harassing her and tried to get him to leave. Jill eventually admitted she was inside

with her youngest son and Stewart. B.H. had already left for school. Although Jill insisted that they were fine, Waddick persuaded her to let them inside.

Stewart opened the door to the officers. Once inside, they saw a very "frail and white" Jill laying on a bed. She was covered up by a blanket and wearing a sweatshirt with the hood up. Brokens immediately noticed that Stewart had a pocketknife in his front pants pocket. The officer removed the knife and got Stewart to step outside to talk with Waddick. Brokens stayed inside with Jill.

Once Stewart was outside, Waddick patted him down and found brass knuckles in his rear pants pocket. While talking to Stewart, Waddick saw that he had blood on his hands, forearm, elbows, shirt, and shoes. Stewart told Waddick that Jill called him that morning to help her clean up blood before her sons woke up. He claimed that he didn't know what happened to her or what time he got to the house, telling Waddick, "Let her tell you."

Back inside, Jill told Brokens that the night before, people broke into her house and beat her up. But she couldn't remember how many or who. Brokens then made a protective sweep of the house. In the kitchen, he saw a bloody folding chair against the counter and blankets spread across the entire floor. When Brokens lifted one of the blankets, he found a pool of dried blood. Concerned, he went back to Jill, telling her, "There is blood all over." Brokens asked where she was injured and if she needed an ambulance. Jill resisted getting medical treatment, but Brokens called an ambulance anyway. While they were waiting for it, one of the officers told Stewart there was a lot of blood in the kitchen. He responded, "Yeah. I know that." The officer asked Stewart why he didn't call an

ambulance, and Stewart said it was because he "didn't find no blood on her." He suggested the blood was from Jill's menstrual cycle.

As Jill was brought out of the house by emergency medical responders, Stewart yelled at her: "Hey Jill! What happened? Let me know what happened." Jill responded, "Somebody broke in here and beat me up last night. That's why I called you at 7:00 this morning." But the only incoming call on Stewart's phone was from his cousin "Law" at around 6:00 a.m.

At the hospital, Jill was treated for multiple lacerations "on her scalp, on her face and forehead, on her back and on her right thigh." She also had contusions on her body, face, head, and finger. Jill was in "acute distress" upon her arrival at the hospital and received two pints of blood. Her scalp wounds, one of which was down to the skull, were closed with staples, while other lacerations were sutured. The emergency room physician who treated her said that even though the wounds were not life threatening, they would leave scars. Jill was discharged from the hospital later that evening.

Stewart was arrested and charged with first-degree kidnapping, willful injury causing serious injury, three counts of domestic abuse assault, attempt to commit murder, and two counts of child endangerment. With Stewart in jail, Jill began to open up about what had happened to her.

Jill testified at trial that when she and Stewart began dating, they had a really good relationship—"nothing violent." That changed on December 2, 2021, according to Jill. After putting her sons to bed around 8:30 p.m., she and Stewart stayed up, "talking, kissing, hanging all over each other, having a good night." They eventually moved into Jill's bedroom and tried to have sex. But when Stewart

couldn't maintain his erection, Jill said he "just went crazy and psycho," slicing the top of her head with his pocketknife.  Stewart then began yelling at Jill about some money he thought that he had lost.

Bleeding from her head, Jill testified that she went into the kitchen to look for the money.  About fifteen minutes later, Stewart came up behind Jill while she was still in the kitchen and hit the back of her head with something hard.  Before he hit her, Jill heard him say, "Why did you kill my brother?"  One of Stewart's brothers, whom Jill had never met, died the year before from a methamphetamine overdose.[1]  The blow knocked Jill to the floor.  She then felt Stewart slash her back with his knife—a cut that went from the top of her shoulder down to her tailbone.  While Jill was lying on the floor, she heard Stewart call his mother and tell her, "I know who killed my brother."  Phone records show this call lasted twenty-one minutes.  He also sent messages to his other brother that stated, "I found out who killed Gunny," and "I merk 1 and I'm finna go get the rest."  "Gunny" was the deceased brother's nickname.  And "merk," according to an investigating officer, "means to kill."

At some point, Stewart told Jill to get up and sit on a folding chair in the kitchen.  He began interrogating her and punching her in the face while demanding, "Tell me what you did to my brother."  During the beating, Jill passed out on the floor by the back door to the kitchen.  When she regained consciousness, Jill saw that Stewart had cut her right thigh with a knife.  That cut extended from the side

---

[1] There is no evidence in the record that Jill had anything to do with the death of Stewart's brother.

of her upper thigh down past her knee. Jill told Stewart that she needed medical attention, but Stewart told her that she "would be fine."

With help from Stewart, Jill crawled from the kitchen floor to the upstairs bathroom. Jill took her clothes off, and Stewart put her in the bathtub to clean her up. He stayed with her for a bit before going downstairs and passing out. Jill laid in the tub for "[p]robably like an hour and a half." She then made her way back downstairs and grabbed an old t-shirt from the basement to wrap around her head. Jill sat up on a couch all night, fearing that she was going to lose her life. When asked why she wouldn't let the police in the next morning, Jill testified: "I was just scared. I did want them inside but didn't know how to get them inside" since Stewart was still there with her. As for the break-in story, Jill explained that she made it up because she loved Stewart and "[d]idn't want to believe he did that" to her.

Before the trial, Stewart moved to exclude the testimony of Rachel Haskin, a forensic interviewer for St. Luke's Child Protection Center. She interviewed Jill's sons several weeks after the assault. The district court denied Stewart's motion, telling defense counsel that objections would need to be made during Haskin's testimony. But the only objection Stewart raised when Haskin testified was to the admission of two drawings that B.H. made during his forensic interview with her. The State interpreted the drawings as showing Stewart covered in blood and holding a knife. The court did not rule on the objection until B.H. testified, at which time the court admitted the drawings into evidence. The court also overruled objections Stewart made to eighteen photographs of Jill's injuries in various stages of recovery.

After the State rested, the court granted Stewart's motion for judgment of acquittal on the two child-endangerment counts. The jury acquitted Stewart of first-degree kidnapping but convicted him of attempt to commit murder in violation of Iowa Code section 707.11 (2021), willful injury causing serious injury in violation of section 708.4(1), domestic abuse assault causing bodily injury in violation of section 708.2A(2)(b), domestic abuse assault while using or displaying a dangerous weapon in violation of section 708.2A(2)(c), and domestic abuse assault with intent to cause serious injury in violation of section 708.2A(2)(c).

Stewart appeals, claiming that (1) his two convictions under Iowa Code section 708.2A(2)(c) violate double jeopardy, as do his convictions for willful injury causing serious injury and domestic abuse assault causing bodily injury; (2) the evidence was insufficient to support his conviction for attempted murder; and (3) the district court abused its discretion in admitting certain exhibits and testimony.

## II. Analysis

### A. Double Jeopardy

The United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This clause protects against: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. *State v. McKettrick*, 480 N.W.2d 52, 56 (Iowa 1992).

Stewart makes two distinct double-jeopardy claims under the multiple-punishments category—one involving a claim that the same statute was charged

multiple times and another involving a merger issue. *See State v. Ross*, 845 N.W.2d 692, 701 (Iowa 2014) (distinguishing between the two types of claims). While we review questions involving the interpretation of statutes and merger for correction of errors at law, to the extent that resolution of these claims depends on constitutional principles, our review is de novo. *See State v. West*, 924 N.W.2d 502, 504 (Iowa 2019); *State v. Lindell*, 828 N.W.2d 1, 4 (Iowa 2013); *see also State v. Chapman*, 944 N.W.2d 864, 871 (Iowa 2020).

### 1. Same statute

For his first claim, Stewart argues that his convictions for domestic abuse assault while using or displaying a dangerous weapon and domestic abuse assault with intent to cause serious injury violate double jeopardy because they fall under the same code section—Iowa Code section 708.2A(2)(c).[2] This provision states that "[o]n a first offense of domestic abuse assault, the person commits. . . . [a]n aggravated misdemeanor, if the domestic abuse assault is committed with the intent to inflict a serious injury upon another, or if the person uses or displays a dangerous weapon in connection with the assault."

Focusing on the word "or" in section 708.2A(2)(c), Stewart argues the statute "clearly provides two alternative avenues for the prosecution to prove the crime, not two separate crimes." As a result, he asserts "the State erroneously parsed this statute into two separate offenses." But this argument ignores the well-established proposition "in Iowa law that a single course of conduct can give rise to multiple charges and convictions." *State v. Velez*, 829 N.W.2d 572, 584

---

[2] We elect to bypass the State's error-preservation challenge to deny the claim on its merits. *See State v. Taylor*, 596 N.W.2d 55, 56 (Iowa 1999).

(Iowa 2013). When interpreting other statutes, like the one criminalizing intimidation with a dangerous weapon with intent, our supreme court has recognized "a defendant may assault the same victim twice, as long as the assaults are separate and distinct acts." *Ross*, 845 N.W.2d at 706; *accord Velez*, 829 N.W.2d at 584 (finding two separate acts of willful injury against the same victim).[3] This is because a "defendant should not be allowed to repeatedly assault his victim and fall back on the argument his conduct constitutes but one crime." *Constable*, 505 N.W.2d at 478 (citation omitted).

Thus, "multiple punishments can be assessed after a defendant is convicted of two offenses that are not the same." *State v. Smith*, 573 N.W.2d 14, 19 (Iowa 1997). "To constitute the same offense for the purpose of invoking the Double Jeopardy Clause, the offenses must be the same act. Separate acts, even charged under the same statute, are not subject to Fifth Amendment analysis." B. John Burns, 4A *Iowa Practice Series, Criminal Procedure* § 38:3 (2023 ed.); *accord State v. Zmuda*, No. 11-0563, 2012 WL 470201, at *2 (Iowa Ct. App. Feb. 15, 2012) ("Double jeopardy principles . . . do not apply when a defendant is convicted of multiple offenses for different assaults.").

Stewart does not argue that his two convictions under section 708.2A(2)(c) were for the same act or complain about the sufficiency of the evidence supporting

---

[3] Like with these other statutes, section 708.2A proscribes domestic abuse assault in terms of the singular—when a person performs "an" assault. Iowa Code § 708.2A(1); *State v. Constable*, 505 N.W.2d 473, 477 (Iowa 1993) ("Throughout chapter 709, the legislature proscribed sexual abuse and related crimes in terms of the singular, when a person performs 'a' or 'any' sex act."); *accord Velez*, 829 N.W.2d at 580 (discussing the importance of the legislature's use of the phrase "an act" to denote the unit of prosecution).

two separate assaults. *Cf. Ross*, 845 N.W.2d at 705–06 (examining the sufficiency of the evidence to support defendant's multiple convictions for intimidation with a dangerous weapon with intent). We will not do so for him. *See Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996) ("[W]e will not speculate on the arguments [a party] might have made and then search for legal authority and comb the record for facts to support such arguments."). Because Stewart's claim is confined to an interpretation of section 708.2A(2)(c) that conflicts with the above caselaw, we reject this assignment of error.

### 2. Merger

Stewart next claims that his convictions for willful injury causing serious injury and domestic abuse assault causing bodily injury violate double jeopardy because the latter offense is a lesser-included offense of the former.[4] When determining whether the legislature provided for double punishments in the merger-context, "our first step is to apply the legal-elements test that compares 'the elements of the two offenses to determine whether it is possible to commit the greater offense without also committing the lesser offense.'" *State v. Johnson*, 950 N.W.2d 21, 24 (Iowa 2020).

Stewart concedes that under "the strict, elements-based approach . . . these statutes appear to be sufficiently distinct as to not violate double jeopardy protections" because "each contains a single element the other does not." We

---

[4] Stewart mentions section 701.9 in passing, which is a codification of "the double jeopardy protection against cumulative punishment." *State v. Anderson*, 565 N.W.2d 340, 344 (Iowa 1997). "If the Double Jeopardy Clause is not violated because the legislature intended double punishment, section 701.9 is not applicable and merger is not required." *State v. Halliburton*, 539 N.W.2d 339, 344 (Iowa 1995).

reached the same conclusion in *State v. Smith*, where a defendant pled guilty to "two crimes that arose from the same act"—domestic abuse assault and willful injury causing bodily injury. No. 15-1252, 2016 WL 3281037, at *1 (Iowa Ct. App. June 15, 2016); *see also State v. Rodriguez*, 636 N.W.2d 234, 247 (Iowa 2001) (finding domestic abuse assault while using or displaying a dangerous weapon and domestic abuse assault causing bodily injury were not lesser-included offenses of willful injury causing bodily injury). Yet Stewart argues that under the second step in our analysis, which considers "whether the legislature intended multiple punishments for both offenses," *Halliburton*, 539 N.W.2d at 344, we should find his conviction for domestic abuse assault causing bodily injury merged with his conviction for willful injury causing serious injury. We reject this argument.

In *Smith*, we agreed with the State that the defendant "was subject to multiple punishments for the single act of assault because the crimes of domestic abuse assault and willful injury were intended to address separate evils." 2016 WL 3281037, at *1; *accord Johnson*, 950 N.W.2d at 26 (declining to merge offenses "when the underlying statutes focus on 'different dangers'"); *State v. Butler*, 415 N.W.2d 634, 637 (Iowa 1987) ("By enacting separate statutes the legislature addressed separate evils."). We see no reason to depart from that conclusion here. *Cf. McKettrick*, 480 N.W.2d at 58 (finding a "clear indication" of legislative intent that a defendant, who committed a single assault, "may not be convicted of and receive multiple punishments for both assault with intent to commit serious injury and assault causing bodily injury").

**B. Sufficiency of the Evidence—Attempt to Commit Murder**

For the attempted murder charge, the jury was instructed that the State was required to prove the following beyond a reasonable doubt:

> 1. On or about December 3, 2021, the defendant struck [the victim] and cut her with a knife.
> 2. By his acts, the defendant expected to set in motion a force or chain of events which would cause or result in the death of [the victim].
> 3. When the defendant acted, he specifically intended to cause the death of [the victim].

*Accord* Iowa Code § 707.11(1). Stewart challenges the sufficiency of the evidence supporting the last two elements.

We review challenges to the sufficiency of the evidence for correction of errors at law, giving high deference to the verdict. *State v. Burns*, 988 N.W.2d 352, 370 (Iowa 2023). In doing so, we view "the evidence 'in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.'" *State v. Ortiz*, 905 N.W.2d 174, 180 (Iowa 2017) (citation omitted).

With this standard in mind, we turn to Stewart's specific arguments. He first argues that the evidence was insufficient because while Jill "did suffer from extensive injuries from the events that took place that night," the medical evidence established the cuts and blood loss were "insufficient to cause her death." But in *State v. Young*, our supreme court explained it is "the actor's expectation of the consequences of his or her act, not the probability of the act's success" that is relevant. 686 N.W.2d 182, 185 (Iowa 2004). More bluntly: "factual possibility or probability of success is utterly irrelevant." *Id.*; *accord* Iowa Code § 707.11(3) (stating it is not a defense "that the acts proved could not have caused the death of any person, provided that the actor intended to cause the death of some person

by so acting, and the actor's expectations were not unreasonable in the light of the facts known to the actor").

Stewart next argues the only direct evidence of his intent "is the testimony of Jill . . . herself," which he says is implausible. First, "any nicks in the veracity of a witness are left to the inspection of the jury." *State v. Boutchee*, No. 17-1217, 2018 WL 3302010, at *3 (Iowa Ct. App. July 5, 2018). "It is not our place 'to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury.'" *State v. Brimmer*, 983 N.W.2d 247, 256 (Iowa 2022) (citation omitted). So while Jill's trial testimony differed from statements she made at the scene and after, those conflicts were for the jury to sort out.

Second, "[s]pecific intent is seldom capable of direct proof." *State v. Hunt*, 801 N.W.2d 366, 376 (Iowa Ct. App. 2011) (citation omitted). As a result, the State may establish intent "by circumstantial evidence and by inferences reasonably to be drawn from the conduct of the defendant and from all the attendant circumstances in the light of human behavior and experience." *State v. Casady*, 491 N.W.2d 782, 787 (Iowa 1992). Here, we have both direct and circumstantial evidence showing Stewart's intent to cause Jill's death.

After he sliced Jill's scalp open, knocked her to the ground with a blow to the back of her head, and cut her along her spine, Stewart messaged his brother: "I found out who killed Gunny" and "I merk 1 and I'm finna go get the rest." An investigating officer testified that "merk" is a common slang word meaning "to kill." From this, a jury could infer, as the State argued in closing, that Stewart thought he had killed Jill sometime during his assault. *See id.* Jill also testified that when

Stewart first sliced her scalp in bed, she "immediately thought he was trying to kill" her and screamed, "Please, no, I have children." That fear remained as the attack continued, with Jill testifying that she was scared for her life while Stewart was punching her on the folding chair. Even after the assault ended, Jill testified that she sat on the couch all night, afraid that she was going to die.

While Jill's injuries were not life-threatening, they were extensive. *See Hunt*, 801 N.W.2d at 377 (noting that victim's "extensive and severe injuries," while not life-threatening, were circumstantial evidence of defendant's intent to seriously injure and kill the victim). She received fifteen staples in her head, had multiple knife lacerations sewn up with sutures, suffered multiple contusions all over her body, and lost twenty percent of her body's blood volume according to doctors who testified for the State. The multiple deep cuts to Jill's body and blows to her head are further evidence of Stewart's murderous intent. *See id.* ("Intent to kill or seriously injure another may be inferred from the type and number of injuries suffered by the victim."); *accord Boutchee*, 2018 WL 3302010, at *3 (finding repeated blows to a victim's head "and the slashing of his wrist—both locations on the body vulnerable to mortal injuries—qualified as overt acts in furtherance of [defendant's] specific intent to kill"). Viewing this evidence in the light most favorable to the State, a rational trier of fact could conclude that Stewart acted with the requisite intent. *See Hunt*, 801 N.W.2d at 377.

## C. Evidence Issues

Stewart next claims the district court abused its discretion in (1) admitting two pictures B.H. drew as "hearsay not falling into any exception"; (2) allowing forensic interviewer Rachel Haskin to testify; and (3) admitting photographs

showing Jill's healing injuries. We review these "evidentiary rulings for an abuse of discretion. However, the standard of review for hearsay is for errors at law." *State v. Fontenot*, 958 N.W.2d 549, 555 (Iowa 2021) (citation omitted).

*1.     Drawings*

During B.H.'s testimony at trial, the prosecutor presented him with two pictures that he drew during his forensic interview with Haskin. B.H.'s testimony about these drawings, like the rest of his testimony, was limited:

> Q. I'm handing you two pictures that I have copies of. Do you remember those? A. Yeah.
> Q. What are they? A. Don't know.
> Q. Did you draw them? A. Yeah.
> Q. And when you were drawing them, what were you thinking about? A. Reggie.
> Q. You were thinking about Reggie? A. (The witness indicated affirmatively.)
> Q. Are those pictures of Reggie? A. Yeah.

The district court admitted the drawings into evidence, overruling Stewart's hearsay objection. In closing arguments, the prosecutor interpreted the drawings as showing Stewart "covered in blood holding a knife."

On appeal, the State concedes the drawings are hearsay but contends they were properly admitted as past recollections recorded under Iowa Rule of Evidence 5.803(5). Alternatively, the State asserts admission of the drawings was not prejudicial because they were cumulative of other evidence, which overwhelmingly established Stewart's guilt. We find the latter argument dispositive.

"The erroneous admission of hearsay testimony is presumed to be prejudicial unless the contrary is established affirmatively; however, the court will not find prejudice if substantially the same evidence has come into the record

without objection." *State v. McGuire*, 572 N.W.2d 545, 547 (Iowa 1997). There was abundant evidence at trial that came in without objection about the amount of blood at the scene and on Stewart—from officers, the video B.H. sent to his father, body cam videos, and pictures of the scene. Corporal Waddick testified that during his contact with Stewart the morning after the assault, he "observed that he had blood across his body. It was on his elbows, his hands, his forearm, and what I suspected at the time to be blood on his shirt." There was also blood on Stewart's shoes and on the pocketknife and brass knuckles the officers removed from his pants pockets. A criminologist testified that the blood on both weapons matched Jill's DNA profile. We agree with the State that the drawings, which "at most suggested that Stewart had blood on him and may have been holding an object in his hand," were cumulative to this "other evidence establishing the bloody scene, the bloody defendant, and the bloody weapons."

We also agree with the State that "the force of [the drawings] paled in comparison to the overwhelming evidence of Stewart's guilt," as detailed above. *See State v. Elliott*, 806 N.W.2d 660, 669 n.1 (Iowa 2011) ("Another way to show the tainted evidence did not affect the jury's verdict is to show other overwhelming evidence of the defendant's guilt, making the prejudicial impact of the tainted evidence insignificant."). Yet Stewart contends the drawings impacted the jury's verdict on attempted murder because the prosecutor used the drawings to play on the jury's sympathies, arguing in closing:

We know [B.H.] saw something, right?[5]  Like, that is—that's straight out of a horror movie.  That's an eleven-year-old drawing the person who's been living with them for the better part of a year covered in blood holding a knife.  My interpretation of the exhibit.  You know, [B.H.] wouldn't talk about it here.  He wouldn't talk about it in front of the Defendant except to acknowledge that he was drawing the Defendant, but that's what that drawing is.  That's something he saw that night.

The jury, however, acquitted Stewart of first-degree kidnapping—another indication that the drawings, which were a small part of the State's case against Stewart, were not prejudicial.  *See State v. Taylor*, 689 N.W.2d 116, 130 (Iowa 2004) (noting the court's acquittal of the defendant on a kidnapping charge was "an indication the bad-acts evidence did not motivate the fact finder to categorically rule against the defendant"); *accord Rodriguez*, 636 N.W.2d at 243 n.4 (observing the jury acquitted the defendant of one offense, which indicated a lack of prejudice).

### 2.    *Haskin testimony*

Stewart next claims the district court abused its discretion in allowing Haskin to testify about "the nature of her work, how she conducts interviews with children, and what she looks for and sees when she conducts those interviews" because that testimony was "irrelevant to any issue before the trial court."  Although Stewart objected to Haskin's testimony in a motion in limine, the court ruled "objections are going to have to be made during her testimony and then we'll deal with it on the record."  And when Stewart renewed the objection at trial before Haskin testified, the court repeated:

---

[5] At trial, B.H. denied seeing Stewart the night of the assault.  His younger brother also told an officer that he didn't see anything.  But the younger brother testified that he heard Stewart yelling at his mom about money and "[a] lot" of pounding.

I think for purposes of appeal and the record, I think you have to lodge your objection tomorrow during the witness's testimony. So I'm not going to exclude her. She can come in and testify. . . . [A]ny specific question that she's asked that you think is improper or objectionable, make sure you lodge that objection tomorrow.

But the only objection Stewart made during Haskin's testimony was when the State offered B.H.'s drawings as exhibits. Because he raised no other objections, Stewart failed to preserve error on this issue. *See State v. Harlow*, 325 N.W.2d 90, 91 (Iowa 1982) ("[T]he granting or rejecting of a motion in limine is not reversible error. The error occurs, if at all, when the matter is presented at trial. An objection should then be made in order to preserve error."); *cf. State v. Mark*, 286 N.W.2d 396, 410 (Iowa 1979) (recognizing an exception to this rule if the ruling reaches the ultimate issue and unequivocally declares the evidence admissible or inadmissible).

### 3. Photographs

Stewart finally claims the court abused its discretion in admitting photographs showing Jill's injuries in various stages of healing. He argues "[t]heir probative value is nil. The prejudicial effect, however, is substantial as they constitute a cumulative pile of grotesque evidence used to inflame a jury." *See* Iowa R. Evid. 5.403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice. . . .").

Our supreme court has "long recognized photographs are not inadmissible simply because they are gruesome or may tend to create sympathy if there is just reason for their admission." *State v. Neiderbach*, 837 N.W.2d 180, 202 (Iowa 2013) (cleaned up). "Trial courts have discretion in determining whether the

value of pictures as evidence outweighs their grisly nature." *Id.* We find no abuse of that discretion here.

Some of the charges lodged against Stewart required the State to prove that Jill suffered a serious injury. The jury was instructed that a "serious injury" is "a bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement or extended loss or impairment of the function of any bodily part or organ." Because the photographs showed Jill's injuries and their long-term effects, they were relevant to the issue of serious injury. *See id.* (finding that because a video and photograph showed the child's condition "before trial and reflected the long-term effects of the injuries [he] had sustained," they were "relevant to the issue of the victim's serious injury"); *accord State v. Perez*, No. 22-0276, 2023 WL 152524, at *3 (Iowa Ct. App. Jan. 11, 2023). And the photographs, which fairly depicted Jill's condition, "were not so *unfairly prejudicial* as to substantially outweigh their probative value." *Perez*, 2023 WL 152524, at *3. They simply "embellished the verbal picture of the events already provided by the victim." *State v. Munz,* 355 N.W.2d 576, 580 (Iowa 1984) ("Even if we assume the evidence was cumulative, that is not a sufficient reason, standing alone, to require its exclusion. . . .").

III.    Conclusion

We affirm Stewart's convictions, concluding his rights against double jeopardy were not violated and substantial evidence supported the jury's verdict finding him guilty of attempt to commit murder. As for the claimed evidentiary errors, we find Stewart was not prejudiced by the admission of the child's drawings, error was not preserved on his objection to the forensic interviewer's testimony,

and the photographs showing the victim's injuries were not so unfairly prejudicial as to outweigh their probative value.

**AFFIRMED.**