# IN THE COURT OF APPEALS OF IOWA

No. 21-1243
Filed August 30, 2023

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**PERRY DELYNN KNAPP SR.,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Jones County, Jason D. Besler,

Judge.


Perry Knapp Sr. appeals his convictions for four counts of sexual abuse in

the second degree, two counts of lascivious acts with a child, one count of incest,

one count of child endangerment, and four counts of sexual exploitation of a minor.

**AFFIRMED.**


Elizabeth Araguás of Nidey Erdahl Meier & Araguás, PLC, Cedar Rapids,

for appellant.

Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney

General, for appellee.


Considered by Bower, C.J., and Tabor and Greer, JJ.

**BOWER, Chief Judge.**

Perry Knapp Sr. appeals his convictions for four counts of sexual abuse in the second degree, two counts of lascivious acts with a child, one count of incest, one count of child endangerment, and four counts of sexual exploitation of a minor. He contends (1) the trial court abused its discretion in denying his motion to sever trial on the sexual-exploitation-of-a-minor counts, (2) the trial court abused its discretion in allowing the jury to see images of child pornography in light of his stipulations as to their contents, (3) the trial court erred in denying his motion to suppress the first search warrant, and (4) there was insufficient evidence of knowing possession to sustain the sexual-exploitation-of-a-minor convictions.

We find no abuse of discretion in the denial of the motion to sever or in the court's evidentiary ruling. There was probable cause for the search warrant. Finally, there was substantial evidence to support Knapp's convictions for sexual exploitation of a minor. Therefore, we affirm.

**I. Background Facts and Proceedings.**

On September 17, 2017, thirteen-year-old E.K. disclosed to friends, then to a cousin, and later to her mother, that her father had sexually abused her at his home from the time she was in third grade through the sixth grade. E.K. was fearful when she told her mother about the abuse because she was warned to keep quiet or something bad would happen to those she cared about.

In a September 19 interview at a Child Protection Center (CPC), E.K. described a number of specific instances of sexual abuse she had been subjected to by Knapp. She reported the first time he had sex with her she was eight or nine years old and he first showed her a video of people having sex. E.K. reported

Knapp continued to have sexual contact with her most times she visited his home, he showed her pornographic materials, and he warned her not to tell anyone or people she loved would get hurt.

Deputy Sheriff Jason Feldmann observed the CPC interview and, based on E.K.'s reports, he obtained a search warrant to search Knapp's house and vehicles for items including:

> (1) All visual depictions, including still images, videos, films, or other recordings, of pornography to include child pornography as defined in 18 U.S.C. § 2256 or child erotica, including depictions in digital, electronic, documentary, or other form, and any software, hardware, mechanisms, or data used for or capable of being used for the possession, accessing, viewing, receipt, distribution, advertising, or production of the same, including but not limited to:
> Any computer, computer system, electronic, magnetic or optical storage device, and related peripherals, . . . .

When the warrant was executed on September 20, the items law enforcement seized included two cellphones identified as Knapp's and a desktop computer tower.[1] Additional warrants later allowed forensic computer searches of the seized items.

The search of Knapp's computer revealed over 100 suspected images of child pornography in unallocated space, meaning that the files had been deleted and were no longer accessible to the user though they had been visible on the computer at some time. The internet search history contained searches for child pornography. The computer—in user-accessible space—had Knapp's resume

---

[1] In addition to those found in the home, Knapp had two phones on his person when he arrived during the search of his home; Knapp reported one was used for work and one was for personal use.

and job application materials last accessed in June 2012, as well as photos of Knapp's wife and children.

One phone was located on Knapp's side of the bed between the box spring and mattress. That phone had twenty images depicting "females from what appeared to be the ages of [eight] to [fourteen] . . . exposing their genitalia or engaged in various sex acts." Another phone contained "possible child pornographic pictures, social media and child pornography, search term hits."

On February 27, 2020, a trial information was filed alleging four counts of second-degree sexual abuse, "in the years 2011 through 2015" Knapp "did unlawfully and willfully commit sexual abuse against E.K" (Counts I through IV); two counts of lascivious acts with a child, "in the years 2011 through 2015" Knapp "did unlawfully and willfully commit lascivious acts with E.K., a minor child, by permitting or causing a child to fondle or touch his genitals or pubes and by causing the touching of his genitals to any part of the body of the child" (Counts V and VI); one count of incest, "in the years 2011 through 2015" Knapp "did unlawfully and willfully perform sex acts with his biological child" (count VIII); one count of child endangerment, "in the years 2011 through 2015" Knapp "did unlawfully and willfully endanger the safety of E.K." (Count IX); and eight counts of sexual exploitation of a minor occurring between 2011 and 2015, seven of which alleged Knapp "did unlawfully and knowingly purchase or possess a visual depiction of a minor engaging in a prohibited sexual act or the simulation of a prohibited sexual act" (Counts X–XVI), and one alleging Knapp attempted to create a visual depiction of a child engaged in a sex act or simulated sex act (Count VII).

Knapp filed a motion to suppress evidence obtained by the September 2017 warrant, contending there was not probable cause to issue the warrant because the alleged abuse occurred between 2011 and 2015 and there was nothing in the application for a search warrant about an on-going offense nor "any reliable information for a magistrate to consider as to why child pornography would still be located upon such a device two years later."

After a hearing, the court ruled:

[T]he court would note that [Knapp]'s motion to suppress deals exclusively with the allegedly pornographic material found on one or more of his telephones and one or more of his computers, all of which were located in the residence which was searched by virtue of the search warrant. As such, this motion to suppress impacts only the eight sexual exploitation of a child counts (Counts VII, X, XI, XII, XIII, XIV, XV and XVI).

Deputy Feldmann was present at the time of the CPC interview with E.K. and heard firsthand accounts of her specific and detailed allegations of sexual abuse by [Knapp]. He had interviewed E.K.'s mother, who confirmed that [Knapp] possessed and was "into" pornographic videos and pictures. The affidavit attached to the search warrant application which was dated September 19, 2017, adequately noted and provided information possessed by Deputy Feldmann that desk top computers, laptops, tablets and cell phones are often connected and can be used to store and view pornographic materials. E.K.'s testimony during the CPC interview categorically establishes that computers and phones were used by [Knapp] to show E.K. pornographic materials. The affidavit was specific in terms of the place to be searched and why those particular objects were being searched for. The court finds that the application and affidavit absolutely provide a nexus between the sexual abuse as alleged by E.K. and the use of child pornography in the perpetration of that abuse. Further, because courts have acknowledged that pornographic materials are saved by perpetrators of sexual abuse for future viewing, the fact that the last alleged abuse occurred two years prior to the application for the search warrant on September 19, 2017, does not make the warrant stale. Sexual exploitation of a child on multiple occasions by virtue of showing and use of pornography represents an ongoing activity, especially given the character of the crime. In addition, the sexual exploitation occurred in a specific place which was narrowly crafted into the search warrant application. Finally, the use of that pornography by

[Knapp] had an enduring utility to [Knapp] such that it would be unlikely for him to destroy it or move it to a location outside of his residence. The court therefore finds that the time span between the criminal activity alleged and the search warrant and subsequent search of the property which revealed the pornographic materials on fixed electronic devices belonging to [Knapp] is not stale.

Knapp filed a motion to sever charges, arguing that trying all the allegations together would unfairly prejudice him due to the sheer number of charges, the disgust child pornography invokes, and the difference in the elements of the various offenses.

The prosecutor argued,

[Knapp] perpetrated a multi-year campaign of sexual abuse against his biological daughter. As part of his scheme, he employed child pornography to gain her trust and to teach her that fathers having intercourse with their young daughters was normal, also to show her how she should look, to look sexy.

. . . .

The various images of the sexualized children that were found on [Knapp]'s electronic devices can be directly linked to his campaign to groom the child and then to convince her that the ongoing behavior was okay or normal and that other parents and children have the same relationship.

The district court noted the evidence relevant to the various charges would likely overlap and that the interests of judicial economy prevailed. The motion to sever was denied.

Trial was held on May 4, 5, 6, 7, 10, and 11, 2021. Now sixteen-year-old E.K. testified that, during the times in question, she lived with her mother during the week and stayed at Knapp's house on weekends. Her stepmother worked evenings, and E.K. described Knapp as an alcoholic who drank regularly.

The first time Knapp sexually assaulted E.K. was when she was going into third grade. Knapp first started "tickling" her over her clothes and then under her

clothes. He then asked her to go into the bathroom with him where he pulled out his penis and asked her to lick it. She resisted and yelled. Her little brother came to the bathroom door and asked what was happening. E.K. said Knapp opened the door and peeked out, told the child E.K. was having explosive diarrhea, and then slammed the door. Knapp then "gave up on that" but later the same day, Knapp added beer to E.K.'s drinks.

> And then he had taken me to his bedroom at the time and showed me what—like different types of porn[2] and then, like, was explaining to me, like, what sex was and then—And then we—after a while, we had sex.
> Q. Okay. Do you remember what kind of sex happened that day? A. It—his penis never went inside my vagina. It was more of me just being on top and scooting.
> Q. So he had you sit on top of him while he had an erection? A. Yes.
> Q. And scooted you back and forth? A. Yes.

E.K. stated the sexual assaults first started when her bedroom was upstairs. Later her bedroom was moved to the basement; E.K. testified her stepmother was pregnant and expecting a girl. E.K. testified after Knapp sexually assaulted her,

> I felt a lot of guilt, if that makes sense, and I just wanted to make sure that that wouldn't—nobody else would be put in the situation. . . . And so I, like, brought it up to him because I felt it was necessary, and I asked if he wouldn't do this to her if I kept doing it.

His response was "essentially yes." E.K. testified,

> It was—it was mostly a routine where everybody said goodnight and we would say, like, our prayers before bedtime and I was usually last. So it was just kind of the same thing over and over again with me being on top and him on bottom and like what I had told you.

---

2 E.K. testified Knapp showed her pornography on his computer in his bedroom that involved "a bunch of girls, like, being lined up—not like my age, but, like, older women" and oral sex.

She testified one time the "sex situation" occurred in Knapp's bedroom after they had been watching a particular movie. She stated the assaults "happened more weekends than not" but as she began to go through puberty "it slowed down." The sexual abuse stopped when E.K. was eleven.

E.K. testified about first telling her friends about the abuse when she was thirteen years old and in eighth grade. She then told her cousin, who told E.K.'s mother. When the defense asked E.K. about the delay in her reporting the abuse, E.K. responded:

> Personally because I was threatened and it's—that was my personal experience, and especially at that young age, I didn't understand, like, how to tell anybody, if that makes sense.
> Q. Sure. A. And it wasn't—I just felt a lot of the times that nobody would take me serious[ly], and it was a very big trauma response for me. Like it was a way to cope.
> Q. And you said that you were threatened. What went on there? A. He—when it first started, he told me that if I had told anybody, that he would hurt the people that, like, I love and care about.

The defense also asked E.K. about her comments at the CPC interview about pornographic images: "From memory, it appears you talked about your father. You used the term pornographic images and the only specifics you gave was something about a teenage girl who was on a beach naked." E.K. responded, "Oh, okay. So that's just what I needed [to understand your question]. I thought you were talking about pictures of myself. I didn't know you were referring to the child porn, but yes." Questioning continued:

> Q. All right. Well, regardless, 2017, that's the only statement you made. You didn't offer statements about minors or, you know, explicit sexual pictures of minors; correct? A. Sure.
> Q. Well, I'm asking you. We want your honest memory, please. A. That is my honest memory.

Q. Okay.  A. I just didn't know I needed to go into that much detail at the time.  I thought explaining what happened to me was enough.  I didn't know I needed to go into every single picture or video that I saw, if that makes sense.

Q. But do you see how it makes sense today in 2021, you're saying, you know, lack of details was not a big deal, but there's repercussions from that today about—  A. I'm not saying it's not a big deal.  I just didn't disclose it.

Deputy Feldmann testified he was assigned to investigate E.K.'s allegations and observed her September 2017 interview from another room.  He stated he sought a search warrant due to

information [that] came out throughout watching that interview such as the—when the child was shown pornographic materials on a computer and videos, the child was shown pornographic images on a cellular device and the child was asked to—or by the defendant to videotape her as she was to dance naked or wearing a skirt.

The deputy testified he and others conducted the search pursuant to the warrant and located several electronic and cellular devices:

The computer tower at this point was down in the basement.  There was a cellular device that was located in between the box spring and the mattress in the master bedroom.  There were multiple cellular devices that were found in a—a dresser drawer in the master bedroom also and I believe the laptop was in the kitchen/living room area.

The detective noted a cellular device was found that "contain[ed] child pornography material."  He testified the devices were sent for further analysis to Mid-States Organized Crime Information Center, which has more experience and resources.  Illegal material was found.

Out of the presence of the jury, extensive discussion occurred about the admissibility of the recording of E.K.'s CPC interview and the interviewer's report.  The court determined neither the recording of the interview nor the report would be admitted and the forensic interviewer could not testify about E.K.'s statements.

Two CPC forensic interviewers testified. Rachel Haskin, who conducted the interview with E.K., explained the general process and stated the purpose of her interviews with children is to provide a safe and neutral space for them to share accurate information to understand what the child is saying and to help identify any treatment needs and safety concerns. Another interviewer at the same center— who was not involved with E.K.—also testified generally about CPC interviews.

Dr. Regina Butteris testified she examined E.K. at the CPC and found no physical manifestations that indicated sexual abuse. She also testified,

> Exams are normal in sexual abuse for a few different reasons. One would be that there was no injury to begin with, so sexual abuse that might not leave an injury would be like oral sex or fondling or touching. There's often a delay in disclosure, so there's been time from the incident of abuse until I see the child. The genital area heals very quickly and very completely, so many times there are no residual findings related to a possible injury.

Greg Wilson, a child abuse assessment worker for the department of human services, was assigned on September 19 to investigate E.K.'s reports of sexual abuse by her father. He interviewed E.K.'s mother that day and observed E.K.'s CPC interview on September 20. He completed his assessment report in October.

The jury was excused. The defense renewed their motion to sever the charges of sexual exploitation of a minor. The court again denied the motion and provided its reasoning. Additional discussion about the use of the images found on the devices occurred. The prosecutor indicated the intent was to use one image per sexual-exploitation-of-a-minor charge extracted from the computer tower and the phone found under the mattress.

Discussion then turned to a possible stipulation of the content of the images. The court asked the prosecutor, "[W]hat is the State's purpose for showing the

images if the defense is willing to agree that the images are, in fact, qualifying images; that there's prohibited sex acts on there? These individuals are minors. They're willing to agree to all of that." The prosecutor responded she was not prepared to make a stipulation on "a brand new topic."

The following day the parties met outside the presence of the jury to discuss the specific images the State intended to use for each sexual-exploitation-of-a-minor count and from what device it had been extracted. The State provided seven images, four from the computer tower and three from a cellphone.

The defense then offered this stipulation:

COMES NOW the below signed and stipulates that the facts of this case prove beyond a reasonable doubt element 2 of the offense of Sexual Exploitation of Minors as charged in Counts 10 to 16 of the Information, to wit:
    That for each count 10 through 16, there is material that shows a person under the age of 18 years, (a) engaging in "prohibited sexual act(s)" and/or (b) engaged in the simulation of "prohibited sexual act(s)," as the term "prohibited sexual act" is defined in Iowa Code [sections] 728.1(7) and 702.17.

The defense argued that in light of the proposed stipulation the court ought to preclude admission of the images the prosecutor intended to submit, asserting the court had the discretion to exclude relevant evidence when its probative value was outweighed by the danger of unfair prejudice under Iowa Rule of Evidence 5.403. The defense contended the actual images were unnecessary and, in light of the court's denial of the motion to sever, would improperly incite the jury.

The prosecution maintained that the images on the device constituted the offense, the State was entitled to present that evidence, and the jury was entitled to see it because they had been informed of the charges and were told they would see the images. The prosecutor argued a limiting instruction would best allow the

State to present the probative evidence while ensuring the jury would not use the evidence for improper purposes in their deliberations.

The court recognized the stipulation did not eliminate the State's need to prove the defendant knowingly possessed the illegal images. The court noted a limiting instruction would be given to the jury:

> And the real concern is just the—I know for the defense the shocking nature of some of the images. My concern is that the potential for the size of these pictures to be imbedded in their mind and to think that this is what they were like when they were found.
> Now, with that being said, I'm not limiting the State to argue their theory that they got—they would have been blown up through clicking stuff like that. That's not my—I want to make that very clear. The State gets to present evidence about that, but my main issue is I think the jury should see what they look like when they were found, rather than just what the State believes at some point your client would have viewed them as. And I think since you're stipulating to the fact that they're minors and there's a sex act, there's less need for it to be blown up to show that to the jury, and I think the jury will get the general idea through the thumbnail [images], particularly supplemented with your expert witnesses and that you're not hiding anything from them.

The court allowed the State to use "thumbnail" images noting, "I think this is the way that is an appropriate balance of the competing interests of [rule 5.]403 and I think it sufficiently does it, though [the defense's] objection is noted."

Karl Djerf testified he performed the September 25, 2017 forensic analysis of the electronic items seized when the search warrant was executed. Djerf testified he did not locate any images of E.K. on the computer tower. But he did find "what I would call suspicious videos; appeared to be showing underage females in either see-through clothing or clothing that wasn't completely covering their chest or their genitalia or their anus." In addition, "In the unallocated search, I found JPEG files and other image files that appeared to depict prepubescent and

pubescent females and males in various states of nudity and performing various sex acts." He testified he found over 100 images that depicted children in sexual situations or undress on the computer tower. On the cellphone found between the mattresses, there were about twenty pictures of females who looked to be eight to fourteen years old exposing their genitalia or engaged in various sex acts.

Djerf testified he also employed a program call Griffeye, a computer data base "of other files that have either been identified as known child victims or suspected child victims and I put the images into that program and it flagged several images as being either known or suspected child pornography." Djerf then identified four images—marked as exhibits 7 through 10—as having been found on the computer tower, which were confirmed as known child pornography. Djerf explained "the fact that they're known child pornography means that an investigator has spoken to the actual child victim and they confirmed that when that picture was taken, they were under the age of [eighteen]." Those exhibits were admitted over the defense's objections.

Djerf also testified he found files on the tower that "appeared to be a resume from Mr. Perry Knapp and a prospective jobs document also from Mr. Perry Knapp" last accessed on June 13, 2012. He also found "what appeared to be family photos of the subject, who had been identified to me as Perry Knapp. Some photos contained his wife . . . and then various children with them." These files were not in unallocated space, i.e., they continued to be accessible to the user.

Djerf testified generally only the owner of the specific electronic device would be able to download items to it, and, in child pornography cases, it was not unusual to find images stored on "mobile devices, computers, thumb drives, hard

drives, you know, portable hard drives, Dropbox accounts that weren't even actually on computers, cloud-stored services" in a wide variety of formats and some older technology.

Djerf also testified he found thumbnail images of suspected child pornography on another cellphone, which were not submitted as evidence. He explained,

> [T]here's different ways thumbnails can be created. A typical way is if you have a full file on your device, the operating system will create a smaller version of it so that if you see, you can open up a folder and it shows all your, you know, pictures; there's a thumbnail version of it and you click on it and it gets bigger. That's one way a thumbnail can be created.

Djerf acknowledged that the fact a thumbnail image of a picture is found on a phone was "not definitive" of whether the user of the phone knew it was created.

Kristen Hamamoto, a digital forensic analyst, testified about her analyses of the cellphones and computer tower. With respect to a cellphone that had been locked and inaccessible by Djerf, Hamamoto testified she was able to analyze the contents with newer technology. Hamamoto explained she found "possible child pornographic pictures, social media and child pornography, search term hits, nonpornographic child images, the device user name that was stored on the phone . . . And profile picture name possibly may have been the P.K., Sr." She stated, "I'm saying possible child pornography because to classify an image or a video as child pornography is beyond my scope of expertise, but while I'm performing an analysis, I do have to make judgment calls and so I will categorize as possibly child pornography in my reports." As to the computer tower, Hamamoto found "internet

search hits, possible child pornographic pictures and possible child pornographic videos."

The State rested, and the defense moved for judgment of acquittal on all the charges.

The trial court dismissed four of the sexual-exploitation-of-a-minor charges: Counts VII (attempting to create a visual depiction of a child engaged in a sex act or simulated sex act) and Counts XIV, XV, XVI (for which no exhibits were presented).

The defense's revised stipulation was admitted.[3]  The defense's forensic analyst testified generally about recovery of files from unallocated space on a device.  They also presented the testimony of a licensed clinical and forensic psychologist, Katherine Ann Jacobs, whose "expertise is educating a jury based on reliability and not credibility of witnesses."  She testified as to terminology surrounding how memory is created and maintained and perhaps distorted by the passage of time.

Knapp's now fifteen-year-old son—E.K.'s step brother—then testified.  He said he had never heard of mixing lemonade with beer, nor had he heard anyone talk to him about "explosive diarrhea."  On cross-examination, he stated the last time he saw E.K. was three years ago.  He also stated that when E.K. was between the ages of eight and eleven, he and his three younger brothers were all in the household.

---

[3] The stipulation was revised in light of the dismissal of counts fourteen through sixteen.

The case was submitted to the jury, and Knapp was found guilty of all remaining charges. Knapp appeals, challenging the court's denial of his motion to sever and motion to suppress, its ruling allowing the thumbnail images to be admitted, and the sufficiency of the evidence to sustain the four convictions for exploitation of a minor.

## II. Scope and Standards of Review.

We review the denial of motions to sever multiple charges against a single defendant and evidentiary rulings for an abuse of discretion. *State v. Romer*, 832 N.W.2d 169, 181 (Iowa 2013) (motion to sever); *State v. Lacey,* 968 N.W.2d 792, 805 (Iowa 2021) (evidentiary decisions). "A district court abuses its discretion when it bases its decisions on grounds or reasons clearly untenable or to an extent that is clearly unreasonable." *Id.*

Constitutional issues are reviewed de novo. *State v. Gogg*, 561 N.W.2d 360, 363 (Iowa 1997).

We review sufficiency-of-the-evidence claims for correction of errors at law. *Romer*, 832 N.W.2d at 174.

> In reviewing challenges to the sufficiency of evidence supporting a guilty verdict, courts consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence. We will uphold a verdict if substantial record evidence supports it.

*Id.* (citation omitted). "Evidence is substantial if it would convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *State v. Jorgensen*, 758 N.W.2d 830, 834 (Iowa 2008).

**III. Discussion.**

*A. Motion to Sever.* Knapp contends the court abused its discretion in denying his motion to try the exploitation-of-a-minor charges separately. We note Knapp does not assert the charges were improperly joined.[4] Consequently, it was Knapp's burden to show the prejudice to him in a trial on all charges outweighed the "State's interest in judicial economy." *See Romer*, 832 N.W.2d at 181.

In its ruling, the district court correctly set out rule 2.6(1) and supporting case law. It found all the charges against Knapp constituted parts of a common scheme or plan, explaining:

> All offenses are perpetrated against or involve [his] daughter, E.K., over a period of time between 2011 and 2015. All offenses are alleged to have occurred at [his] home. As alleged, [Knapp] used pornography and child pornography to groom the victim, including to familiarize her with what sex was and to assure her that sex between fathers and daughters was normal. As alleged, [Knapp] sometimes had intercourse with [E.K.] and other times fondled her or had her fondle him, but in all instances acted for his own sexual gratification. As demonstrated by the Minutes, the modus operandi of each alleged offense was the same or similar.

The court then addressed whether Knapp had shown "good cause." The court summarized Knapp's claim—that "failure to sever counts as proposed would be unfairly prejudicial because of the risk that the jury would convict him based on evidence of propensity, particularly considering the significant number of separate

---

[4] Iowa Rule of Criminal Procedure 2.6(1) provides,

> Two or more indictable public offenses which arise from the same transaction or occurrence or from two or more transactions or occurrences constituting parts of a common scheme or plan, when alleged and prosecuted contemporaneously, shall be alleged and prosecuted as separate counts in a single complaint, information or indictment, unless, for good cause shown, the trial court in its discretion determines otherwise . . . .

counts and the similarity in some of the elements of some of the counts." The court noted our supreme court had rejected an attempt to equate evidentiary rules with severance principles in *Romer* and the likelihood that at least some evidence related to the exploitation charges would be relevant and admissible to prove the others weighed in favor of judicial economy. *See id.* at 182. Here, the court's reasons are neither untenable or unreasonable. We find no abuse of discretion.

*B. Evidentiary Ruling.* Knapp next asserts the court abused its discretion in admitting the pornographic images. He argues that by stipulating the images found on the computer tower were of persons under the age of eighteen and engaged in "prohibited sexual acts," the need for jury examination of the images was moot.

"Ordinarily, the test of admissibility of photographs is relevancy and materiality." *State v. Hunt*, 801 N.W.2d 366, 374 (Iowa Ct. App. 2011) (citation omitted). Relevant evidence is generally admissible, *see* Iowa R. Evid. 5.402, but relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice," *see* Iowa R. Evid. 5.403. "Evidence that 'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action [that] may cause a jury to base its decision on something other than the established propositions in the case' is unfairly prejudicial." *State v. Henderson*, 696 N.W.2d 5, 10–11 (Iowa 2005) (alteration in original) (citation omitted).

There can be no contention the images were highly probative—knowingly possessing such images constitutes the offense. In *State v. Long*, this court acknowledged images of children being sexually exploited "are at a minimum distasteful, shocking, and deplorable, but that is the nature of the charged

offenses." No. 17-0597, 2018 WL 1433628, at *4 (Iowa Ct. App. Mar. 21, 2018) (citing cases).

The question presented is whether the admission of this highly relevant evidence is unfairly prejudicial. "Weighing probative value against prejudicial effect 'is not an exact science,' so 'we give a great deal of leeway to the trial judge who must make this judgment call.'" *Lacey,* 968 N.W.2d at 807 (citation omitted).

As already set out in this opinion, the district court engaged in a thorough analysis of the defendant's objections and admitted only a limited number of thumbnail-sized images. Moreover, the court's instruction to the jury that they were to consider the images only for the sexual-exploitation-of-minors charges reduced the risk the jury would consider the images for an improper purpose. We find the court's reasoning was neither clearly unreasonable nor untenable and the court did not abuse its discretion.

*C. Motion to Suppress.* The State obtained a search warrant allowing it to search Knapp's home for items that might contain digital data of "pornography [including] child pornography." After finding a number of items containing digital data, the State obtained additional search warrants to analyze the data contained on those items. On appeal, Knapp argues the district court should have suppressed the evidence seized with the first search warrant because it lacked probable cause and relied on stale information.[5]

"A search warrant must be supported by probable cause." *State v. Baker,* 925 N.W.2d 602, 613 (Iowa 2019) (citing Iowa Const. art. I, § 8); *see also* U.S.

---

[5] The State agrees that if the first warrant was invalid, the others were as well.

Const. amend. IV. "The test for probable cause is 'whether a person of reasonable prudence would believe a crime was committed on the premises to be searched or evidence of a crime could be located there.'" *Baker*, 925 N.W.2d at 613 (quoting *Gogg*, 561 N.W.2d at 363).

When examining challenges to probable cause to support a warrant, we "do not make an independent determination of probable cause." *State v. McNeal*, 867 N.W.2d 91, 99 (Iowa 2015). Instead, we merely determine "whether the issuing judge had a substantial basis for concluding probable cause existed." *Id.* (quoting *Gogg,* 561 N.W.2d at 363). "[W]e draw all reasonable inferences to support the judge's finding of probable cause and give great deference to the judge's finding"— "[c]lose cases are decided in favor of upholding the validity of the warrant." *Id.* at 100 (first alteration in original) (quoting *Gogg*, 561 N.W.2d at 364).

Here, the trial court found probable cause supported the search warrant application. Deputy Feldman's application was based on specific statements E.K. made during the CPC interview that her father showed her pornographic materials on his computer and on his phone in an effort to convince her that sexual behavior between a parent and child was normal, that he showed her pornographic material—including child pornography—before sexually assaulting her, and that the sexual assaults took place in various rooms.

The deputy also noted that in his training as an officer, he had learned or encountered situations "involving sexual acts or concerning sexual activity with minors or minor children." He noted, "Perpetrators who are involved in such acts often possess pornographic material or images which are often utilized in the process of grooming minor children." In addition,

Perpetrators often possess these types of materials to fulfill their sexual fantasies. I also know that certain persons who commit crimes against children possess cameras, hidden cameras, and other such devices to record these acts to relive such acts. I also know that electronic devices such as but not limited to computers, cell phones, SD/SM cards, hard drives, and other storage devices are used to store sexual images and videos. These stored videos and images can be used for sexual gratification and be used to relive images or videos of performed sexual acts. I know these such devices can be transported, stored and hidden within the residence, on persons and within vehicles.

The United States Supreme Court has recognized that "evidence suggests that pedophiles use child pornography to seduce other children into sexual activity." *Osborne v. Ohio,* 495 U.S. 103, 111 (1990). In *United States v. Colbert*, the defendant contended the trial court erred in denying his motion to suppress the search warrant because it was not supported by probable cause. 605 F.3d 573, 576 (8th Cir. 2010). He argued "the affidavit did not establish a link between the evidence of enticement at the park and child pornography in his home." *Id.* The appellate court noted probable cause is viewed through common experience and is a "fluid, non-technical concept[ ]." *Id.* at 578.

> Evidence adduced to support probable cause must be "weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." The probable cause analysis is "not readily, or even usefully, reduced to a neat set of legal rules."
> There is an intuitive relationship between acts such as child molestation or enticement and possession of child pornography. Child pornography is in many cases simply an electronic record of child molestation. Computers and internet connections have been characterized elsewhere as tools of the trade for those who sexually prey on children.

*Id.* (internal citations omitted).

In *United States v. Allen*, No. 21-03013-01-CR-S-MDH, 2023 WL 3562963, at *5 (W.D. Mo. Mar. 20, 2023), the defendant challenged a search warrant,

alleging the affidavit to search for pornography relied on information "that was five years old and thus stale." The magistrate reviewing the defendant's motion to suppress noted:

> "The date of the occurrence of the facts relied upon in an affidavit is of importance in the determination of probable cause because untimely information may be deemed stale." [*United States v.*] *Summage*, 481 F.3d [1075,] 1078 [(8th Cir. 2007)]. However, staleness is not determined by a bright-line test, but rather is "examined in the context of the specific case and the nature of the crime under the investigation." *Id.* The essence of sexual abuse of a child and production of child pornography "involves the abuse of a trust and power relationship, which frequently delays reporting until the minor has obtained majority." *United States v. Augard*, 954 F.3d 1090, 1094 (8th Cir. 2020). Further, it "is not a new revelation" that individuals involved in sexual exploitation of children do not quickly dispose of child pornography. *United States v. Lemon*, 590 F.3d 612, 615 (8th Cir. 2010) (holding an eighteenth month interim lapse did not render the information stale); *see also United States v. Espinoza*, 9 F.4th 633, 636 (8th Cir. 2021) (Eighth Circuit precedent "recognizes the compulsive nature of the crime of possession of child pornography and the well-established hoarding habits of child pornography collectors."); *Summage*, 481 F.3d at 1078 (when timeline of events was not included in the affidavit, "it could be presumed that [the defendant] would maintain in his possession the video and photographs [containing child pornography] that he made").

*Allen*, 2023 WL 3562963, at *5 (alterations in original).

Our supreme court is in accord. *State v. Woodcock*, 407 N.W.2d 603, 604-05 (Iowa 1987) (finding an eighteen-month gap between criminal conduct and warrant being issued seeking pornography related to sexual exploitation of children and sexual abuse of minors did not render the information stale). The *Woodcock* court noted, "[T]he nature of the offense is a factor bearing on a claim of staleness, and it would be reasonable for an issuing magistrate to conclude that a person charged with sexual exploitation of children through photographs and similar items would be likely to retain them for an indefinite period." *Id.* at 605

On our de novo review and based on the totality of the circumstances here, we agree probable cause supported the warrant application.

*D. Sufficiency of the Evidence.* Finally, Knapp asserts there is insufficient evidence he knowingly possessed the child pornography to sustain the sexual-exploitation-of-a-minor counts.

Viewing the evidence in the light most favorable to upholding the verdicts, we conclude there is substantial evidence from which a reasonable jury could find Knapp knowingly possessed the four images submitted into evidence from the computer tower. E.K. testified Knapp would show her pornography on the computer in his room. There was evidence the tower, which was found in the basement of the home in 2017 previously had been located in Knapp's bedroom. Forensic analysis found "[o]ver 100" pictures believed "to be children in sexual situations or undress." In analyzing one of Knapp's phones, the analyst found "Internet search hits, possible child pornographic pictures and possible child pornographic videos." Taken together, a reasonable jury could infer Knapp knew he possessed child pornography. Substantial evidence supports the convictions, and we affirm.

**AFFIRMED.**